**Carla BRUNING, Petitioner and Appellee,**

v.

**James JEFFRIES, Respondent and Appellant.**

No. 15840.

Supreme Court of South Dakota.

Considered on Briefs Feb. 16, 1988.

Decided April 13, 1988.

Gary Colwill, Asst. Atty. Gen., Pierre, for Dept. of Social Services; Roger A. Tellinghuisen, Atty. Gen., on brief.

William J. Ellingson, Flandreau, for petitioner and appellee.

Robert Van Norman, Rapid City, for respondent and appellant.

MILLER, Justice.

This is an appeal from a judgment of the circuit court upholding a decision of the Secretary (Secretary) of the South Dakota Department of Social Services (DSS), which increased Father's previously court-ordered child support obligation using the statutory guidelines (SDCL 25-7-7). We reverse with directions that the case be remanded to consider and enter findings regarding the financial condition of both parents, including Mother's spouse.

FACTS

Carla Bruning (Mother) and James Jeffries (Father) are parents of Corey Ray Bruning (Corey), who was born on May 27, 1977. Mother and Father have never been married to each other. Initially, Father made voluntary support payments in varying amounts. On June 28, 1979, a circuit court approved and adopted a voluntary support agreement that Father had signed with DSS under which he was obligated to pay $100 per month to Mother on behalf of Corey. On February 20, 1981, the circuit court (pursuant to agreement of Mother and Father) modified the obligation to $75 per month while Father attended college and $100 per month while not attending college.

In August, 1986, Mother filed a petition with DSS for modification of child support. In accordance with SDCL 25-7A-22, an administrative hearing was held by a DSS hearing examiner, at which time both Mother and Father appeared, testified, and

submitted various documents. The hearing officer issued a proposed decision and order which was adopted on November 4, 1986, by Secretary.[1] This order set Father's support obligation at $220 per month by applying the guideline table in SDCL 25–7–7. Further, Father was required to furnish medical insurance coverage for Corey.

Father filed a notice of appeal from Secretary's decision to circuit court. The court entered judgment affirming Secretary as to the amount of child support but reversed Secretary's order requiring Father to provide medical insurance coverage. Subsequently, the circuit court denied Father's motion to reconsider, which motion specifically asked the court to consider the income of Mother's new spouse or third-party contributions to the child's household as set forth under the "deviations" in SDCL 25–7–7. This appeal followed.

Mother is married presently to an osteopathic physician (Dr. Bruning) practicing in Flandreau, South Dakota. She works as a part-time bookkeeper at Dr. Bruning's clinic. Father is a deputy state's attorney for Pennington County, South Dakota.

## ISSUE

### WHETHER SECRETARY ERRED IN SETTING FATHER'S CHILD SUPPORT OBLIGATION.

Father argues that Secretary abused his discretion *in not deviating* from the guideline table. Father claims Secretary did not take into consideration (1) Father's financial condition and (2) Mother's spouse's income, arguing that either consideration could have justified a downward deviation from the guideline table.

■ SDCL 25–7–7 is a lengthy, detailed, and complicated statute[2] which, among other things, sets forth mandatory guide-lines for the administrative agency and courts to follow when setting child support. No one section or paragraph in the statute can be read in isolation. It must be considered as a whole. The amount of child support is set by considering, among other factors, the obligor's net income and the number of children. The statute specifically provides, in pertinent part:

These guidelines *shall* be used in setting child support. Deviation from the guidelines may be made only upon the entry of specific findings based upon the following factors:

(1) *Financial condition of the parents, including, but not limited to, income of a new spouse or contribution of a third party to the income or expenses of that parent;*

(2) The standard of living of the child;

(3) The age and special needs of the child;

(4) The effect of provisions relating to custody and visitation; or

(5) Child care. (Emphasis added.)[3]

As the above-quoted portion of SDCL 25–7–7 indicates, there may be no deviation from the guidelines unless there is an entry of specific findings regarding the five listed factors. The question becomes whether Secretary (and hearing examiner) must consider these factors in every case he hears. We conclude, from a reading of this statute in its entirety, that the legislature intended that these factors be considered in each proceeding.

It seems clear in this case that Secretary (and hearing examiner) chose not to consider any of the deviations, since there is no specific finding of deviation and the support was set within the initial guideline table.

---

1. Because the hearing examiner's decision in a contested proceeding becomes *the final* decision (SDCL 25–7A–22—see also 25–7A–6), it is not clear to us how or why the Secretary became involved in this appeal. Since it is not properly before us, we do not address the procedural aspects. *See* SDCL 25–7A–5 et seq.

2. *See* SDCL ch. 25–7A which adds to the complexities involved in collection of child support.

3. For an exceptional analysis of salient issues concerning the deviations enumerated under this statute, *see* L. Pierce, "Do the Permitted Deviations Create Consistency or Confusion? *South Dakota Barrister,* V. 113 (Nov.–Dec. 1986).

### A. Father's Financial Condition

■ Father claims his financial condition is such that he cannot reasonably satisfy his own needs and obligations with support set at the level ordered by Secretary (and hearing examiner) and affirmed by the trial court. Father submitted evidence regarding his personal debts, including a substantial student loan obligation. Father claims that if these loan payments (student loan and other debt) are considered, his income available for support is substantially less. Father claims these loan obligations are viable reasons for deviation from the guidelines as they directly impact his "financial condition." Thus, we must determine whether Secretary (and hearing examiner) abused his discretion in not utilizing this factor as a basis for deviation.

First, we note that no findings were made, either by the hearing examiner, Secretary, or the trial court, regarding Father's "financial condition" other than determining his net income.

After reviewing the evidence, we conclude that Secretary (and hearing examiner) did abuse his discretion in not *considering* a deviation from the guidelines due to a large student loan and other debts which affect Father's "financial condition." Although SDCL 25-7-7 does not specifically *require* a deviation or deduction for school loan debt, it does not necessarily mean that such should not be *considered.* We therefore direct that this issue be remanded to the administrative agency for reconsideration and entry of findings regarding the totality of Father's financial condition.

### B. Mother's Financial Condition

SDCL 25-7-7 makes both parents "jointly and severally obligated" for the support of the children. We must not overlook SDCL 25-7-8, which provides:

> A stepparent shall maintain his spouse's children born prior to their mar-

riage and is responsible as a parent for their support and education suitable to his circumstances, but such responsibility shall not absolve the natural or adoptive parents of the children from any obligation of support.

It is clear that the support award using the guideline table is not based upon the income of both parents. However, it is not clear what was intended regarding the specific support obligation of the noncustodial parent.[4] Yet, settled case law, prior to the new guidelines, provides that child support awards must be based on the reasonable financial needs of the child *and* the financial means of the parents. *Johansen v. Johansen,* 365 N.W.2d 859 (S.D. 1985); *Gross v. Gross,* 355 N.W.2d 4 (S.D. 1984). We believe that the enumerated deviations of SDCL 25-7-7 were adopted giving consideration to and with no intent to abolish this settled case law. Thus, under SDCL 25-7-7, we question how the appropriate administrative officer can decide whether to deviate from the guidelines in setting support if he does not consider the statutory factors for deviation.

As stated earlier, the administrative officer must in each case consider the five statutory factors to determine whether deviation is warranted. Certainly, if the financial condition of the custodial parent and/or the new spouse is such that it would not be equitable to blindly apply the guideline table to the noncustodial parent, deviation is necessary and appropriate. (Irrespective of the distinction between our statute and Minnesota's, we adopt the logic of their general holdings in *Bredeson v. Bredeson,* 380 N.W.2d 575 (Minn.App. 1986); *Giencke v. Haglund,* 364 N.W.2d 433 (Minn.App. 1985); *Derence v. Derence,* 363 N.W.2d 86 (Minn.App. 1985).) For example, if a noncustodial parent has a net income of $500 per month, it could be improper to strictly follow the guideline table and require him/her to pay monthly support

---

4. One paragraph of SDCL 25-7-7 provides:
   It is presumed that the custodial parent is making a substantial contribution to the child's basic care and needs by paying all expenses of raising the child above those met by the child support payments of the obligor parent. It is further presumed that the custodial parent provides a life style consistent with the custodial parent's resources, and the child receives custodial care and attention which has economic value.

payments of $65–$78 to the custodial parent married to a millionaire, living in luxury.

■ As guidance to the appropriate administrative officer and the circuit courts, we hold that in order to uphold a deviation from the guidelines based on the factors relating to the custodial parent (including any new spouse), the custodial parent's financial condition must be substantially greater than that of the noncustodial parent in order to warrant any significant deviation. By deviation, we are not suggesting that support required of the noncustodial parent be eliminated; rather, all factors under SDCL 25–7–7 must be considered, with findings entered thereon, in order to provide meaningful appellate review at all levels.

The constitutional questions which have been so strongly asserted by Justice Henderson, in his special writing, have been intentionally disregarded in this opinion because appellant, in his brief to this court, *specifically abandoned* any constitutional challenges to the statutory scheme.

Reversed and remanded.

WUEST, C.J., and SABERS, J., concur.

MORGAN and HENDERSON, JJ., concur in result.

MORGAN, Justice (concurring in result).

I concur in the result for all the reasons stated in the majority opinion. This case demonstrates the problems inherent in a statute that gives to an administrative department jurisdiction to perform judicial functions, even though a precise direction is given. Rather than attempt to educate hearing officers to be judges, I submit that it would be more appropriate to remind our trial judges, to whom these administrative decisions are first appealed, that they need not blindly approve those decisions.

HENDERSON, Justice (concurring in result).

Although I concur in the result of this decision, I would reverse for a different reason.

> Circuit court approved/adopted voluntary support agreement. Circuit judge is constitutional officer. S.D. Const. art. V, §§ 1, 3, and 5.

> Circuit court's decision modified by a DSS hearings examiner, a "mini-judge," via SDCL 25–7A–22, contrary to S.D. Const. art. II, DIVISION OF THE POWERS OF GOVERNMENT.[1] Said decision of said mini-judge is a final decision under SDCL §§ 25–7A–6 and –22. This statutory scheme denies South Dakota's citizens access to their judges under the open courts provision of our state constitution. S.D. Const. art. VI, § 20.

> Secretary of DSS blesses his appointee's decision (unconstitutional mini-judge's decision). Circuit judge re-enters judicial picture affirming in part/reversing in part Secretary's decision. Thereby, we witness an unlawful intermixture of judicial/administrative power and violation of doctrine of separation of powers. S.D. Const. art. II.

> Statutory scheme by Legislature authorizing DSS Secretary to create mini-judges with discretion to modify/set child support is unconstitutional under S.D. Const. art. V, § 5. Article V, § 3, is violated in that only the Supreme Court can determine the number of circuits and judges in this state. The child support enforcement amendments of 1984 (Pub.L. 98–378) might well <u>require</u> guidelines but permits/tolerates/authorizes guidelines to be flexible by statute, <u>judicial action</u>, or administrative action. These guidelines are not binding nor do these suggestions obligate a Legislature to create a judicial system within the DSS.

1. Legislatively created judicial officers cannot usurp or overrule a circuit court judge's decision, a circuit judge being a constitutional officer. These "mini-judges" need not have a legal education.

The State Legislature was not mandated by the federal government to create judges in South Dakota to usurp judicial functions. The State Legislature cannot confer upon any agency a power which is granted unto the courts by the state constitution. In effect, the State Legislature attempted to grant jurisdiction of child support to a new group of judges in this state. If this is sustainable in law, then an amendment by the State Legislature could further empower the DSS to determine child custody. Through the state constitution, state statutes,[2] and decisions of this Court, the judiciary has been entrusted to be the guardians of children and to protect their welfare. *Houghton v. Houghton,* 37 S.D. 184, 188, 157 N.W. 316, 317 (1916) (calling children "wards" of the court). Our courts have a very special and awesome responsibility for the care and welfare of children. *Blare v. Blare,* 302 N.W.2d 787, 791–92 (S.D. 1981) (citing *Houghton,* 157 N.W. at 317). This new statutory scheme, begotten initially by federal government dollars, thrusts upon the people of South Dakota more "Statism," and a further opportunity for breakdown in the family unit. The courts exist for the wronged and the oppressed to flee; if state statutes abdicate the courts' responsibilities over children, and a government agency is substituted as Taskmaster/Father/Judge over children, where shall fathers and mothers flee?

No new body of case law on these guidelines would ever be created by this writer until the decision-making process on child support was cleaned up in the statutes of this state. The present scheme of the statutes is an unholy mixture and marriage between the judicial branch and the DSS, all fashioned by the supposed direction of the federal government. It is a wrongful dejudicialization of the judiciary.

The responsibility of the office held by this special writer far transcends the responsibility of the brief writer. When matters of great import reach this Court which vitally affect the superstructure of state government, a duty calls. Although the brief writer desired to abandon the subject of this dissent, I cannot close my eyes because of his decision. His decision belongs, uniquely, to him, and mine belongs uniquely to me. Therefore, for this special writer to raise this issue, and to present it to the Bench, Bar, and students of the law in this state, is not an individual tenet fashioned instanter.[3] Nay, in *Bayer v. Johnson,* 349 N.W.2d 447 (S.D. 1984), then Chief Justice Jon Fosheim wrote:

There is good authority that where the appellate court has jurisdiction on other grounds it may decide a constitutional question on its own motion. This is especially true when the constitutional question is decisive of the appeal, ... or when the point is one of law and not dependent on facts that might have been presented below had the point been there raised.

State officials, including supreme court justices, are by constitutional mandate required to take an oath or affirmation to support the constitution of this state. S.D. Const. Art. XXI, § 3.... We would be less than supportive if we failed to meet that which is constitutionally offensive.

*Bayer,* 349 N.W.2d at 449–50 (citations omitted). This rationale was supported by a quotation from *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 179–80, 2 L.Ed. 60, 74

---

**2.** It is the circuit court which possesses chancery as well as common-law jurisdiction, SDCL 16–6–8; and under SDCL 16–6–9, the circuit court has exclusive original jurisdiction of all actions or proceedings in chancery, to include actions for divorce and annulment of marriage. Example: Entire SDCL ch. 25–9A, entitled "Revised Reciprocal Enforcement of Support," all triggered in the circuit court. SDCL 25–9A–1. Example: Child support payments made through clerk of courts, per SDCL 25–4–43: "[W]hen *the court* has provided for the maintenance of the children of the marriage...." (Emphasis added.) Example: Basic statute on child custody provisions in an action for divorce, SDCL 25–4–45, empowering "the court" to give direction for the custody, care, and education of the children of the marriage, and to "modify" the same.

**3.** A voice of dissent on this sweeping change might also be heard in the halls of the State Legislature. For, after all, has that body not created a committee, by state statute, for the very purpose of reviewing the decisions of this Court? *See* SDCL 2–9–4(8).

(1803), the seminal case establishing the doctrine of judicial review, where John Marshall wrote that the framers of the (federal) Constitution contemplated that instrument as a rule by which the courts, as well as the legislature, would be governed. *Bayer,* 349 N.W.2d at 450. This Court has continued to recognize the "sua sponte" concept in *State v. Jones,* 406 N.W.2d 366, 368 (S.D.1987) ("[T]his court has held it may decide a constitutional question *sua sponte.*"), and *State v. Bonrud,* 393 N.W. 2d 785, 787 (S.D. 1986) ("Although appellant does not challenge the constitutionality of the search *per se,* we may raise constitutional issues *sua sponte.*"). Therefore, our State Legislature cannot simply do what it chooses to do because the constitution governs its rule-making conduct and law-making power.

As Chief Justice Wuest recently wrote, in a special concurrence to an opinion authored by this special writer, "[w]e are a government of checks and balances with the separation of powers among the executive, legislative, and judiciary." *Roden v. Solem,* 411 N.W.2d 421, 422 (S.D. 1987). Now, the constitutional boundaries are becoming blurred. One branch should not be permitted to encroach on the other and in the negation of this blurring encroachment, I abide.